**Dalene F. CHARLES, Plaintiff,**

v.

**THE WICHITA EAGLE AND BEACON PUBLISHING COMPANY, Defendant.**

**No. 97–1400–JTM.**

United States District Court,
D. Kansas.

March 31, 1999.

Mark G. Ayesh, Allyson Yarbrough, Ayesh Law Offices, Wichita, KS, for Plaintiff.

Susan P. Selvidge, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

In the present matter, plaintiff Dalene Charles has brought an action for age discrimination against her former employer, The Wichita Eagle and Beacon Publishing Company. Several matters are before the court. First, the Eagle has moved for summary judgment on Charles's claims. Second, both parties have filed motions to strike in connection with the summary judgment pleadings. The court finds the uncontroverted facts establish that the plaintiff, who worked for the Classified Advertisement Department at the Wichita Eagle, was responsible for several serious errors which were very costly to the newspaper in terms of both money and prestige. Although Charles attempts to shift the responsibility for these errors to one or more other employees, the court finds

the uncontroverted facts show the primary responsibility was hers, and Charles's termination was not a pretext for unlawful discrimination.

### 1. Motions to Strike

██ The recent pleadings in the present action appear representative of an unfortunate tendency by parties to attempt to file what are in effect surreplies, although these are not contemplated by the rules, by the expediency of submitting motions to strike. In the present case there are two motions to strike by the plaintiff and one motion to strike by the defendant. Such practice is disfavored. First, the practice is unnecessary, since the court is not unable to determine whether the materials submitted by the parties in connection with summary judgment pleadings are founded on admissible evidence. Moreover, such motions also have the effect of delaying any ruling on the motion for summary judgment, although here the motions to strike have all been responded to or the time for response has passed.

██ In the present action, the court will deny the motions to strike as moot in light of the following evidentiary rulings. For purposes of convenience, the matters relating to the issues raised in the motions to strike may be addressed here. Specifically, (1) in her motion of December 18, 1998, Charles seeks to exclude evidence submitted by the Eagle showing that much of its work force is older than 40 years of age, thereby rebutting an implication that the motive for Charles's termination was age discrimination; (2) in her motion of January 20, 1999, Charles seeks to strike specific statements in the Eagle's reply brief; (3) in its motion of January 11, 1999, the Eagle seeks to strike various affidavits filed by Charles. In general, the court must concur with the Eagle's arguments as to the affidavits filed by Charles, and disagree with the motions to strike advanced by Charles.

As to the first motion to strike, Charles advances nothing more than the argument that it would be unfair to allow the Eagle to present evidence of an age-balanced work force in light of the fact that Judge Humphreys's order of November 3, 1998 (Dkt. No. 34) denies the plaintiff's motion to compel answers. Charles contends that this order frustrated her ability to present statistical evidence of age discrimination, and thus the Eagle should not be allowed to present evidence of a similar nature.

The court cannot agree. Judge Humphreys's order did not preclude Charles from presenting statistical evidence of discrimination, assuming there is such to be had. Her order was premised on a finding that the requested discovery, which sought to obtain details of retirees from the Eagle and which would require the defendant "to individually review over 1,000 personnel files," (Dkt. No. 34, at 3) were essentially over broad. The order also concluded that the specific information sought—retirees in general—were not necessarily similarly situated to the plaintiff and would not be probative of her claims. The magistrate judge further stated that, in light of plaintiff's improper argument, "the court will reserve the right to reconsider sanctions at the conclusion of discovery." (Id. at 7). The plaintiff's requested discovery was struck down for overreaching. That does not mean the defendant, to the extent it has admissible evidence rebutting a claim of age bias, is not entitled to present it.

Charles's second motion to strike was filed after the Eagle's reply to her response to the summary judgment motion, and is even more clearly a "surreply" than a true motion to strike. The motion to strike is not targeted at improper evidentiary materials, but at specific conclusions, arguments, or inferences made by counsel in the reply. Charles literally seeks to edit or excise specific sentences from the reply. In order to substantiate the motion to strike, Charles offers new evidence—more affidavits from herself and from Timmermeyer—which essentially seeks to circumvent Charles's admissions in her deposition. The court will address the matter in detail later in this opinion, but will note

here the uncontroverted facts still demonstrate that the person with the primary responsibility for the garage sale omissions was Charles.

The Eagle's motion is persuasive. It is directed not at the argument advanced in Charles's brief but at the evidentiary materials cited by her (specifically, a number of affidavits from co-workers). The motion to strike was originally submitted contemporaneously with its reply on the motion for summary judgment. The motion could have easily been incorporated into the reply, and does not appear to be an attempt to evade the general rule which does not allow for surreplies.

On the merits, the Eagle appears to be correct that Charles apparently has collected affidavits from anyone at the Eagle with a complaint against the paper,[1] whether or not they have any personal knowledge of age bias or the facts in Charles's case. The affiants Ware, Revell, Hazen, Brakey, Deloney, Marvin Lewis, Sheila Lewis, Royce Green, and Timmermeyer did not work in the Classified Ad division and were not supervised during the relevant time period by the plaintiff's supervisor. Mundt, Billhorn, and Ek did work in Classified, but the court finds there are valid evidentiary reasons for objecting to the portions of their affidavits to which the Eagle objects.[2] In general, the affidavit evidence complained of by the Eagle is—in relation to Charles's claims—unfounded speculation not based on personal knowledge.

The Seventh Circuit addressed similar affidavits in *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir.1998):

Mr. and Mrs. Drake also argue that the magistrate judge erred in disregarding portions of affidavits that they submitted in opposition to summary judgment and that this evidence, if admitted,

would have gone even further in establishing genuine issues of material fact. The affidavits in question were those of Dave Shevely, Hawkins, and Hamilton, three of the Drakes' co-workers. 3M argues that the district court correctly ignored portions of these affidavits because the affiants' statements lack the factual foundation and personal knowledge required by Rule 56(e) of the Federal Rules of Civil Procedure. Rule 56(e) requires that affidavits offered in opposition to summary judgment "be made on personal knowledge, ... set[ting] forth such facts as would be admissible in evidence, and ... show[ing] affirmatively that the affiant is competent to testify to the matters stated therein." Although "personal knowledge" may include inferences and opinions, those inferences must be substantiated by specific facts. *See, e.g., Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988).

The district court was correct to strike these portions of the affidavits. While we will not delve into each statement individually, the portion of the Shevely affidavit that was stricken stated that: "Management, especially Dean Coleman, took a scapegoat approach in dealing with employee problems and generally tended to cover up matters." Similarly, Hawkins stated that: "Every time I, or any other African American employee went to Dean Coleman with a problem involving another employee, who was white, Dean Coleman would never conduct an investigation or take any action against that white employee." These are exactly the type of conclusory allegations that Rule 56 counsels should be disregarded on summary judgment. "Rule 56 demands something more specific than the bald assertion of the gen-

---

1. The affidavits are those in whole or part of Ek, Dunlap, Ware, Revell, M. Lewis, Hazen, Brakey, Deloney, S. Lewis, Mundt, Green, Billhorn, and Timmermeyer.

2. For example, Ek's affidavit fails to note that progressive discipline policy applied only to

the employees under the Collective Bargaining Agreement while Charles was not such an employee. Similarly, the comments in Mundt's and Billhorn's affidavits about computer "bugs" must be viewed as wholly unqualified speculation.

eral truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir.1983), cert. denied, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984).

While the Drakes argue that Shevely's long tenure at 3M's plant qualifies him to make the assertions contained in his affidavit, this argument misapprehends Rule 56(e)'s requirements. Instead, Sheveley's affidavit should have recounted factual instances, based upon Sheveley's personal knowledge, that demonstrated Dean Coleman's tendency to "cover up" matters. Without these substantiating facts, under Rule 56 we cannot make the reasonable inferences that the Drakes assert militate against summary judgment. *See Davis*, 841 F.2d at 189 ("Because Davis substantiates his allegations of a longstanding custom or policy solely on the basis of his one conclusory sentence in his affidavit, we cannot reasonably infer that such a custom did indeed exist without more."). The district court correctly disregarded these conclusory statements in deciding whether to grant summary judgment. 134 F.3d at 887.

The Tenth Circuit recently approved a similar exclusion in *Chambers v. McClenney*, Slip op., Case No. 97–1468, 1999 WL 7726, at *1 (10th Cir. Jan.11, 1999), where the court wrote:

> The district court also rejected plaintiff's attack on the unfavorable staff survey completed shortly before his termination. Plaintiff contended it was improperly designed and interpreted, and claimed the complaints elicited about his performance were unfounded and racially motivated. The court correctly held that the latter claim reflected only plaintiff's unsubstantiated suspicions, which were not rendered admissible or probative simply by inclusion in a rambling thirty-seven page "affidavit." *See Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir.

1995) ("To survive summary judgment, nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.") (quotation omitted); *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988) (to defeat summary judgment, "a party cannot rest ... on speculation, or on suspicion"). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991) (to create factual dispute precluding summary judgment, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient"); *Smith v. Eastern New Mexico Med. Ctr.*, No. 94–2213, 1995 WL 749712, at *5 (10th Cir.1995), (noting that "In any event, most of the affidavit is inadmissible under Fed.R.Civ.P. 56(e) because it is not based on Smith's personal knowledge. Indeed, it reads more like—and in large part, is identical to—one of plaintiffs' briefs").

Since the specified affiants are not testifying from personal knowledge, their statements accordingly play no role in the factual findings discussed below.

### 2. *Motion for Summary Judgment*

#### A. *Uncontroverted Facts*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The

moving party need not disprove the non-moving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,*7 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Charles worked in the Eagle's Classified Advertising Department for about 26 years. She was terminated after omitting approximately 165 garage sale ads from the May 2, 1997 edition. She was born June 17, 1938, and was 58 years old at the time she was terminated.

Charles's supervisor from 1994 onward was Robert "Bob" Clinger, Classified Manager. Charles had various titles during her employment, including copy control clerk, phone room manager, support staff supervisor, systems manager, sales assistant and control clerk. When Charles was in management, she managed about 24 employees.

Charles lost that supervisory authority in 1993, prior to the time Clinger became her supervisor. The defendant contends that, at that time, a number of employees criticized Charles's conduct to her current supervisor, Juanita Dunlap, and complained of Charles's "anger, attitude, and use of profanity." (Def. Uncontr. Fact ¶ 6). Charles does not controvert the allegation other than to suggest that she did not completely lose her supervisory authority, citing a March 12, 1993 memo from Dunlap titled "Support Staff Restructuring", and contending that Dunlap's notes from February 25 and 26 of 1993, fail to show any concern over Charles's use of profanity.

Otherwise, Charles concedes that "[i]n private discussions with Dunlap plaintiff used profanity." (Resp. at 4). Dunlap's notes state that Charles tended to refer to her staff members as "kids," that she "implied that they would be 'nothing' without her,'" and that she sought to "manage by control, intimidation and fear." (Def.Exh.1, Dep.Exh.7). Dunlap wrote that Charles should "be taken out of the position of having direct contact with her staff on the day to day activities." (Id.) The memo of March 12 states that Charles would continue as the Classified Systems Manager, but it does not otherwise indicate that she would have supervisory authority over staff. Rather, the memo states only that she "will be responsible for administration of the Atex System" and that she would "continue to assist the classified staff in these areas." (Plf.Exh.4). In contrast, the Chief Control Clerk would "oversee the day-to-day operations of the support staff and copy desk." (Id.)

Clinger became the Classified Ads Manager in January, 1994. He made a regular practice of keeping notes on complaints and disciplinary discussions with employees. He began keeping regular notes on Classified employees on February 7, 1994, prior to the reduction in force.

Clinger made notes on 18 dates about Charles's problems with errors, disruptive

office behavior, and complaints about her from other employees. Charles disputes the truth of many of the negative comments in the notes, which she condemns as "contrived." (Plf.Resp. at ¶ 8). She cites affidavits from a number of Eagle employees in support of her contention that the defendant engaged in a pattern of "papering the file" on older employees. With one exception, none of the affidavits are from Classified Ad employees supervised by Clinger. And, with respect to that employee, Clinger had not written any disciplinary notes against him. The records submitted by the Eagle indicate that Clinger wrote a large number of disciplinary notes on employees younger than 40 years old, and that several employees close in age to Charles had no disciplinary notes.

Charles's team of sales assistants, including Robin Pierce and Shawn Houston, complained to Clinger about her during 1996. According to Pierce, the team complained because Charles was not functioning as a team player and had disruptive office behavior. According to Houston, there were complaints about Charles's attitude and outbursts. She would get angry, throw pencils and rulers, slam drawers and disrupt telephone calls. Charles contends the allegations were unfounded, citing the affidavits of various employees, but these affidavits (cited at Plf. Fact ¶ 10) are advanced either by persons who were not a part of the Classified Ad Department and thus not in a position to have personal knowledge of her workplace behavior, or strikingly limited in their application— stating that the affiant himself did not see disruptive behavior.

In early 1996, the Eagle began computer training for employees, preparing to switch in July 1996 from a front-end system to a PC-based system. Classified was computer networked to other functions such as Composing.

Charles had experience on front-end systems. Another Classified employee, Karen McClintock, had worked in the Eagle's technology department with PC programs. McClintock was selected to head the new PC project in Classified. According to Clinger's notes, Charles was upset that she was not chosen to head the PC project. Charles has submitted an affidavit stating that she was not upset over the selection of McClintock to head the PC project.

The new computer software was manufactured by Atex, and called the "Enterprise" system. Atex trained certain Eagle employees in the use of the new system, who then trained others. McClintock was trained in the entry of classified advertising orders.

McClintock testified that Charles made her job difficult with smart remarks, lack of cooperation, and complaints about the new system. McClintock observed that Charles had difficulty with conversion to the PC system. Charles controverts these facts "[t]o the extent that [they] are suggesting that" the issues were not resolved or that she did not get along with McClintock. (Resp. at ¶ 17). McClintock testified that she got along with Charles "for the most part," (Plf.Exh. 24, McClintock dep. at 10), but this does not alter McClintock's explicit description of Charles's conduct during the PC conversion.

Houston from Classified and Trish Devlin from the Composing Department were trained to paginate the advertising copy and send the pages to Composing to be printed. Houston trained four Classified employees in pagination: Charles, McClintock, Robyn Pierce, and Danna Cotton. Enterprise ad input training occurred in early 1996, before the actual switch to the new system occurred in July 1996. Charles received the same computer training and help as other Classified employees.

Kevin Desmond, Vice President of Operations, reported to Clinger that Charles used profanity while she was paginating near the desks of Linda Joplin and Cynthia Trenary. Charles does not dispute the incident.

Cynthia Trenary stated that Charles used the word "fuck" "incredibly a lot,"

and used strong words when she cussed. (Def.Exh. 9, Trenary dep. at 9–10). Charles admitted in her deposition that she used profanity in the workplace, although she denied using the word "fuck."

In 1996, Davis–Moore was the Eagle's largest classified advertiser, and Charles was the sales assistant assigned to the account. Clinger made the assignment because of Charles's reputation for accurate text input and her seniority, to give Davis–Moore the right attention. Charles admitted that she was doing the major work on the account, and that Clinger gave her the assignment.

Charles admitted it was an ongoing expectation in Classified that errors were to be kept to a minimum.

The sale of advertising provides approximately 80% of the Eagle's total revenue, and is critical to the survival of the newspaper. Classified advertising is about 40% of the total advertising revenue. Maintaining a good relationship with large advertisers is extremely important to the Eagle.

In fall of 1996, it was discovered that 18 flat rate billing errors had been made on Davis–Moore classified billings, causing Davis–Moore to be over-billed in excess of $22,000. Fifteen of the 18 errors were made by Charles, accounting for over $18,000 in over-billings. Pierce and Houston made one or two errors. The Davis–Moore errors were caused by failure to pay attention to rate information showing that the ad was flat-rated or special-rated. Pierce and Houston were orally reprimanded by Clinger over the incident.

Charles also failed to prepare five "insertion orders" related to the Davis–Moore billings. Charles blamed salesperson Cynthia Billhorn for not making the insertion orders, but Charles admitted she could have prepared the orders. The failures to prepare five insertion orders were additional errors, not the cause of the overbilling errors.

According to Eagle President Peter E. Pitz, the Davis–Moore errors were extremely embarrassing for the Eagle, and had to be reported to Davis–Moore and credit issued. The Eagle had a history of problems with Davis–Moore and its automobile advertisers, and was very anxious to maintain a good relationship with Davis–Moore, its largest advertiser.

The Davis–Moore errors caused the Eagle's quarterly financial statements to overstate revenue by over $22,000, requiring the booking of contra-revenue in the following quarter, which created a problem for Eagle management with parent company auditors.

Because of her primary responsibility in the billing errors and other performance problems, Charles was demoted and received a reduction in pay in November 1996. There is no evidence Charles made any contemporaneous objection to the demotion and pay cut.

Charles was informed of her demotion and wage reduction in a November 13, 1996 memo from Clinger. The memo also warned Charles against using foul language and warned her that further disruptive office behavior or further errors would place her continued employment at risk. The demotion, pay cut, and warning memo were discussed with Charles in a meeting between Clinger, Charles, and Human Resources Department head Jim Spangler.

Within six months, Charles was discharged for failing to properly paginate and send to print half of the garage sale ads (about 165 ads) for the Friday, May 2, 1997 newspaper.

The Classified employees who had been trained to paginate advertising copy were assigned in rotation to "close" Classified each evening after 6:00 p.m., the deadline for classified ads for the next day's paper. The closing employee was required to stay after 6:00 p.m. and paginate the classified ads for the next day's paper and send the copy over the computer network to the Composing Room to be printed. Only one employee at a time could use the pagination software for the next day's newspaper, and that employee was solely responsible for pagination and transmittal of the

classified ads to Composing to print. The employee assigned to close is also required earlier in the day to make two estimates of the total number of classified ad pages expected for the next day's paper. One estimate is made at mid-morning based on paper figures. Another estimate is made in mid-afternoon, when the closer actually goes to the pagination computer, "extracts" the classified ads, paginates them into pages and makes a written estimate.

On May 1, 1997, when Charles made her 2:00 p.m. extraction, her estimate dropped a page from the morning estimate. Since Friday is a heavy advertising day, with ads being input all day Thursday, Pierce said this was sufficiently unusual to alert Charles to a possible problem with the extraction. Charles did not ask for help or report any problem with the computer software that time, or any other time.

On Thursday, May 1, 1997, when Charles had finished paginating, she went into the Composing Room, as was her regular practice, to check the "Output." The "Output" is a compilation of all news articles and advertising which has been input into the Eagle's computer network and sent to composing to be printed in the next day's paper. Composing prepares the Output, which is the newspaper text on a piece of heavy photographic paper, actual size. The Output is used to photographically prepare plates for the printing process.

The only problem noted with the classified ad pagination software was an occasional problem with transfer of text in small ads called "liners," not garage sale ads. The ad might appear as a blank box, or with order number instead of text. As a result, the paginators made it a practice to check the "Output."

Trish Devlin was the Composing Room Manager on the evening of May 1, 1997. The employee who normally composed the classified ad pages was on vacation on April 30 and May 1, 1997. Consequently, Devlin was obliged to do that job on those two nights, in addition to her own. The newspaper cannot be printed until the Composing Room finishes the Output.

Charles admitted in her deposition that on Thursday, May 1, 1997, she was the closing employee and was responsible for the pagination of classified advertising. In the plaintiff's response to the motion for summary judgment, Charles argues that she was operating under a team system in which she relied on others. The cited evidence in support of this contention is an affidavit from an Eagle employee named Timmermeyer. However, it appears that—notwithstanding the explicit description in plaintiff's response of Timmermeyer as a Classified Ads employee—the evidence establishes Timmermeyer never worked in Classified Ads, that she was employed in a different division, and that time records reveal she was in fact not at work on the day the garage sale ads were omitted. More importantly, Charles never submits any reason for disregarding her explicit statement in her deposition that she was the employee responsible for pagination on May 1, 1997.

On the evening of April 30, 1997, Devlin was obliged to do a manual "re-wrap" of the garage sale ads to make some other ads fit properly. Composing may "re-wrap" or physically cut and paste a page of the Output, rather than re-paginate and reprint a whole section of many pages. The re-wrap made Devlin aware of the space taken by garage sale ads in the newspaper dated Thursday, May 1, 1997.

Normally, the number of garage sale ads goes up from Thursday's to Friday's paper. The heaviest days are normally Friday and Saturday.

Charles knew that the Thursday, May 1, 1996 garage sale ad page had been full.

She went to Composing on the evening of May 1, 1997 and looked at the Output.

According to Devlin, she warned Charles that the volume of garage sale ads was down compared to the night before, and asked Charles if she was sure she had gotten all the ads. Devlin recalls that

plaintiff looked at the Output and said something like, "that's all I have." ·

Charles admitted she looked at the classified ad Output on the evening of May 1, 1997 to check for missing liners. She admitted she did not check the garage sale ads.

The Eagle garage sale ads are arranged by sections or quadrants of Wichita: Northeast, Northwest, Southeast, and Southwest, followed by suburban listings. Each section has a heading in capital letters, in the order NE, NW, SE, SW, followed by the suburban towns in alphabetical order.

The Eagle garage sale ad section printed by Charles had only NE and NW headings, no headings for the SE or SW sections, and no listings for any suburban towns. Charles admitted she failed to check the section headings.

It was not Devlin's job on May 1, 1997 to paginate classified advertising, nor to send paginated material to the Composing · Room, nor to inspect the contents of any pages of the Output, nor to check the pagination computer for missing ads. Devlin was not Charles's supervisor, and she had no authority over Charles.

In her response, Charles accuses Devlin of "intentionally" failing to tell her of the manual re-wrap. Charles does not suggest any motive for this alleged failure. In any event, Charles admitted in her deposition that Devlin told her of the re-wrap. (Def.Exh. 1, Charles dep. at 51).

If Charles suspected any problem with the computer or pagination software, she could have consulted her own or the Pagination Room's pagination manual. If she suspected any problem with the computer or pagination software, she could have called Bob Hoch or Shawn Houston for help. She had their telephone numbers written into her pagination manual.

The Atex garage sale ad pagination software has a number of built-in features to prevent the failure to print all ads in the system. The pagination screen has a computer menu with labeled boxes displayed at all times that allow the paginator to click on the following functions: "Next" box to see the next page (which would display an unnoticed second page); "Page" box to allow viewing in multiple page mode (view more than one page at a time, showing any multiple pages); and "Page Mode" box to check the Page Mode setting for automatic one- or two-page setup. Pierce said she commonly checked these functions. There is also a system monitor displaying at all times the status of the pagination project, and a "Quit" box, which when operated will cause a warning in the monitor window if all pages of ads have not been sent to print.

Charles admitted she could have clicked on "Next" to see if the master control file was set for more than one page and to look at all the pages. She admitted clicking on "Next" was how she discovered the missing ads were in the computer system on Friday morning. She admitted she failed to use "Next" while paginating on the night of May 1, 1997 when she was having trouble extracting the garage sale coupons.

It is uncontroverted that the system monitor box would warn Charles, when she was quitting or exiting the program, that she had failed to send extracted ads to print. However, the paginator must look at the monitor box to observe its messages.

Charles has admitted that the pagination software has a window on the screen to check the status of the project, including more than one page of ads. She admitted that on the night of May 1, 1997, she failed to check that window. She admitted she could have checked the page mode settings to see if the software was putting the garage sale ads in one or two pages.

It is uncontroverted that there is no evidence there was anything wrong with the Enterprise classified ad pagination software on either April 30, May 1, or May 2, 1997. McClintock, who paginated the prior night for the May 1 edition did not have any problem with the pagination com-

puter or software, and did not hear of any the next day.

Early in the morning of May 2, 1997, Clinger received a call from an Eagle employee complaining that her garage sale ad was missing from the paper. Clinger looked at the classified ads and saw that about half the garage sale ads were missing. Two quadrants of the city of Wichita and the suburban ads were not there.

May 2 was a terrible day in Classified. The phones began to ring as upset garage sale ad customers discovered their ads were not printed after they had done all the work to prepare for their garage sales. Management decided to refund each customer with a missing ad for the entire garage sale ad package purchased by the customer. Every Classified employee was pressed to answer every available phone; they apologized and told customers their ads would be credited.

Upset garage sale shoppers also called to complain. The high volume of complaint calls interrupted the normal flow of calls for weekend ad orders. Friday is the busiest day for telephone ad orders. The calls are electronically monitored for how long customers are on hold and "lost calls," in which the customer gives up and hangs up. The number of lost calls on May 2, 1997 was abnormally high, which means revenue was lost.

When Charles came to work, she was told about the missing garage sale ads. She looked in the pagination computer herself, and found the missing ads. The missing page of garage sale ads was printed onto flyers and handed out at the customer service desk.

According to Clinger and Pierce, Charles looked in the pagination computer and reported to Clinger that the ads were there, she just missed them. Charles did not report any problem with the software or computer. Charles denies telling Clinger that she "just missed" the ads.

No employee paginating the classified ads before or after Charles reported any problem causing failure of ads to go to print. Pierce checked the garage sale ad

pagination software on the afternoon of May 2, 1997, and it was working fine.

Besides answering the flood of telephone calls from upset garage sale advertisers and shoppers, the Classified employees had to work overtime to manually correct the billings for all customers whose garage sale ads were not printed. This work was necessary to prevent automated billing of the customers the next day.

The failure to send the second page of garage sale ads to print on May 1, 1997, cost $2,800 in credits to customers, plus additional expenses for lunches and overtime, and lost revenue due to lost calls. The errors were also a public relations disaster, upsetting hundreds of garage sale ad customers and garage sale shoppers.

On May 2, 1997, when Devlin came to work and heard about the garage sale ad omissions, she reported to Clinger that she had done nothing to the software or the output the night before to cause the errors; and that she had warned Charles that the garage sale ad space seemed to be small compared to the day before.

Charles did not blame her failure to print half of the garage sale ads on any computer or software problem. Plaintiff admitted she "contributed" to the garage sale ad error, but partially blamed others who she believes knew that the computer master file was set for two-page extraction, while the previous day's paper appeared to be set in one-page mode.

Charles admitted in her deposition that it was her job to notice what page mode she was paginated in on May 1, 1997. She admitted it is the duty of the paginator to set the number of pages of garage sale ads, and that she failed to do so. According to Pierce, the paginators did not habitually tell each other what page mode they left the software in the night before.

Charles admitted that, in the two-page mode, the garage sale ads are set off by a heavy black line when paginated into two pages. Charles admitted she could have

seen the heavy black line while paginating, but failed to do so.

Other paginators, McClintock and Pierce, testified that every day is different, and it is the responsibility of each paginator to check page settings and the system monitor box daily. The paginators knew that composing re-wraps were common. Composing Room supervisor Devlin stated that communication about a re-wrap is needed from Composing to the person who caused the need for the re-wrap; which was McClintock, not Charles.

Late Friday, May 2, 1997, Clinger began to consider what to do about discipline of Charles. As far as Clinger knew, it was the worst error for Classified in his 20 years with the newspaper. Later in the day, he met with Human Resources Manager Susan Smith to review Charles's file and discuss discipline for the garage sale ads omissions. Smith and Clinger spent 30 to 45 minutes reviewing Charles's file. Clinger and Smith later met with Ron Davidson, Vice President for Advertising.

On May 5, 1997, Smith met with Davidson, Clinger, and Publisher Peter Pitz. Pitz was told that the same employee was involved in the Davis–Moore problem. Charles's work history was discussed.

The decision was made to discharge Charles. The decision was made jointly by Pitz, Davidson, and Clinger, and concurred in by Smith. All of the participants were in the same protected class as Charles, persons over 40 years of age. The stated reason for the termination was that Charles had proven herself to be negligent and unreliable in the performance of crucial parts of her job, in spite of her years of experience.

Clinger, Davidson and Smith met with Charles and told her she was being fired for the garage sale ad omissions. She asked what kind of severance package she was getting, was told there would be no severance pay, and left the meeting.

Charles filed an affidavit with her complaint in the present action, accusing Clinger, Pierce, McClintock and Devlin of "orchestrating" the garage sale ad errors to cause her to fail to print all of the ads, just to get rid of her. She admitted in her deposition that she had no evidence whatsoever that these persons orchestrated or conspired to do anything to cause her to fail to print all of the garage sale ads. Charles admitted that this theory was speculation by her and she had no evidence.

Clinger was not trained and did not know how to use the classified advertising pagination software. Charles has not attempted to controvert Pierce's testimony that Clinger did not know enough about the pagination software to do anything to make Charles make an error, and that Charles's error reflected badly on Clinger as Classified Manager.

Charles admitted in her deposition that she understood an employee could be fired for making errors that cost the Eagle money. She also admitted that she knew of employees being terminated from Classified when she did not know of any reason or cause.

According to Charles's complaint, "The representations made to plaintiff by her supervisory personnel, her annual performance evaluations, the longevity of her employment, her position as a supervisor, the regular salary increases, and her general station at defendant formed the foundation of an implied-in-fact employment contract." (Complaint, at 3, ¶ 9). Charles claims that some of her supervisors told her over the years that she was doing excellent work, and as long as she worked hard and kept her commitment to the Eagle, she could plan on retiring from the newspaper.

Charles has admitted that Clinger did not tell her that. She admitted that the "years without major incident" was what she meant in her complaint by her "station" creating an implied-in-fact employment contract.

The garage sale ad error was the worst error Pierce could recall in her 17 years in the Classified Department. Clinger be-

lieved it was the worst error ever for Classified in his 20 years with the Eagle. He also viewed Charles's Davis–Moore errors as major errors.

Charles claims that "All of plaintiff's employment evaluations reflected that plaintiff met or exceeded defendant's expectations." (Complaint, at 2, ¶ 6). In fact, her Performance Review dated June 27, 1994 by Clinger is marked "Needs Improvement" on "Attitude towards job," on "Judgment," and on "Cooperation with other department members." (Clinger Dep.Exh. 1). Her June 26, 1995 Performance Review by John Ek is marked "Needs Improvement" on "Judgment" and "Cooperation with other department members."

Charles contends that "Pursuant to the established policies and procedures of defendant, plaintiff's employment at defendant was such that plaintiff could only be terminated for cause and then only after (i) progressive discipline; (ii) an opportunity to rectify any perceived problems; and (iii) an opportunity to be heard." (Complaint, at 3 ¶ 7).

Charles produced her copy of the Eagle Employee Handbook current at her discharge. After a message from the publisher, on the next page, above the Table of Contents, is the statement: "This handbook is not an employment contract. Either you or The Eagle may terminate the employment relationship at anytime." There is no progressive disciplinary policy or procedure, no grievance procedure and no termination policy or procedure in the handbook. Charles admitted that the policies of the Eagle were set forth in the handbook, and that she read the handbook.

Charles admitted that the Eagle periodically issued new handbooks over the years, usually with a cover letter explaining changes.

The Eagle offered an Enhanced Early Retirement Plan in fall of 1994. Clinger presented the plan to eligible employees in his department, including Charles, who was vested in the Eagle's retirement plan. Charles did not elect the retirement plan.

A buyout was then offered to all employees, and a reduction in force followed in 1994.

Charles stated in her complaint that Clinger said something like she was an older, "expensive" employee, told her during an evaluation that she had "been there too long and was making too damn much money already," said that he couldn't given her "as much a raise as he could the younger ones because of that," and that she was "getting less than the younger ones" because of that. (Charles dep. at 128, 129, 132). Clinger has stated he made no such remarks. (Clinger dep. at 67).

Charles claims Clinger talked to her about retirement, saying he wanted to retire at 54. When she said she wanted to wait until 65, she claims he said "they way things are going around here, nobody's going to retire by—at sixty-five." She thought they were going to get rid of older people. (Charles dep. at 129, 130, 137). Again, Clinger has stated he did not make these remarks. (Clinger dep. at 67).

Charles thought maybe Clinger talked to her about retirement during 1996, but was not sure and could not say how often.

Charles alleged that Clinger told her she needed a vacation because she was stressed and getting too old to handle the pressures in the newspaper industry. She thought this might have been in 1996, but was not sure. Clinger denied referring to Charles as old.

Charles alleged that Clinger advised her of a new program at the Eagle to encourage early retirement. She believed that this was not related to the 1994 Early Retirement Program, but later. There was no program to encourage early retirement after 1994. Clinger denied discussing retirement with plaintiff except to present the 1994 Early Retirement Plan.

Charles alleged that Clinger said "the Eagle would be putting a lot of us 'old people' out to pasture in the very near future.'" (Charles dep. at 135, 136, 137).

Clinger denied such remarks. (Clinger dep. at 67).

Charles was unable to recall from all her years in Classified any error by any other employee that resulted in the failure to publish a large number of classified ads.

At the time of her termination, the Eagle had about 700 employees. Of those, about 52 percent were in plaintiff's protected class, over age 40. This is so in spite of the 1994 Enhanced Early Retirement Plan, which reduced the number of employees in the class.

The Eagle regularly hires persons in the protected class, currently employing 160 employees hired at age 40 or older, almost one-fourth of the workforce.

At the present time, the Eagle employs 14 of its former retirees part-time, half in their 60s and half in their 70s, because of their skills. All but one were rehired prior to the filing of this lawsuit.

### B. Conclusions of Law

■ The Court most recently addressed the means by which a plaintiff may establish a triable case of age discrimination under the Age Discrimination in Employment Act in *Elza v. Koch Industries,* 16 F.Supp.2d 1334, 1339–40 (D.Kan.1998), and those standards remain applicable here. The court finds that Charles has failed to present evidence either of direct discrimination or evidence which would demonstrate a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Whether viewed as a failure to demonstrate she was performing her job satisfactorily or as a failure to demonstrate that the stated reason for the termination was pretext, the court finds Charles's claim for age discrimination should be dismissed since the uncontroverted facts establish that the primary responsibility for the er-

rors in the Davis–Moore case and the garage sale omissions belongs to Charles. There is no evidence of any, even remotely similar errors being committed by a younger employee who did not receive similar discipline.

As noted in the discussion of the facts, Charles essentially presents a defense which says, in effect, that she was victimized by a conspiracy orchestrated by Clinger.[3] In this version of events, Clinger organized this scheme to victimize her by setting her up to omit the garage sales. The suggested conspiracy is simply not credible. It would mean that Clinger staged the crisis, even though (as Charles has admitted) Clinger did not know enough about the pagination computer to conduct the scheme; the scheme would require the intentional participation of Trish Devlin for whom Charles has not suggested any motive for her participation in the scheme. Further, Clinger in staging the scheme would have to know that Charles could escape the "trap" by the simple expediency of doing her job and catching the error. Finally, even if the "scheme" succeeded, it would reflect almost as badly on Clinger (the supervisor of the Classified Ad Department) as it would on Charles.

The uncontroverted facts establish that the primary responsibility for correct pagination belonged to Charles. Her attempt to blame Clinger, or Devlin, fails for any number of reasons. First, she relies on Timmermeyer's affidavit about "team responsibilities." But, as noted elsewhere, Timmermeyer was not a part of the Classified Department, and was not present on the day in question. In any event, even assuming the existence of a "team responsibility" for the detection of errors in general, the uncontroverted facts establish that the primary responsibility for ensur-

---

**3.** Charles also makes an argument that she was performing her job satisfactorily, based upon positive job reviews. These reviews, however, all come from the earlier period of her employment; they do not come from the period following 1995 when her performance was not satisfactory. The uncontroverted facts indicate that Charles did not receive positive reviews during this time, and was in fact warned against further errors.

ing the correct pagination belonged to Charles.

Charles's reliance on Timmermeyer's affidavit appears to be an attempt to distract from her explicit admission that Devlin did tell her of the re-wrap mode. And, even assuming Devlin did not, Charles expressly does not controvert defendant's Fact ¶ 83, which establishes that Charles should have been aware the computer was in two-page mode, since the ads are set off by a heavy black line in this mode. Charles essentially admitted she could have seen the heavy black line but ignored it. The facts indicate that the pagination software has a variety of features to warn a user of the type of error which occurred here. Those features were operating here— Charles does not controvert the defendant's factual allegation which specifically states the software was in working order— but Charles failed to use them to prevent the error.

■ As a fallback argument, Charles contends that the age discrimination claim should be presented to a jury because she has presented direct evidence of discrimination in the "ageist" comments made, or allegedly made, by Clinger. Even assuming, however, that the comments ascribed to Clinger, as discussed above, were in fact made, the court finds that Charles's claim fails to present a triable case of age discrimination. The Tenth Circuit held in *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir.1994), that stray ageist comments "are insufficient to create a jury issue in an ADEA case." The court held that the plaintiff must present evidence showing a nexus connection between the comments and allegedly discriminatory act. Id. at 531–32. In the present case, it is not clear when the ageist comments which Charles claims to have heard were made, but it appears that they were made (at the least) a year before the 1997 incident which led to her termination. More importantly, any "nexus" is disproved by the uncontroverted facts discussed above which show that age was not a motivating factor in Charles's

discharge. Those facts demonstrate that the error involving the garage sale ads was primarily that of Charles, that she committed the error after previous warnings and disciplinary action, and that the error was both extremely embarrassing and expensive for her employer.

■ Finally, there is the question of Charles's claim of breach of implied contract. Charles alleges that she had an implied contract to only be fired for cause, pursuant to the various factors identified in *Morriss v. Coleman*, 241 Kan. 501, 738 P.2d 841 (1987). Although, as summarized above, Charles has pointed to a wide variety of factors as supporting her implied contract, on examination all (or almost all) of them disappear. The employee handbook, it turns out, in fact directly indicates that Charles was an employee at will. Charles cites her long prior service without censure, but the Tenth Circuit has indicated that prior positive job evaluations do not, without more, demonstrate the existence of an implied contract. *Berry v. General Motors Corporation*, 56 F.3d 1233, 1237 (10th Cir.1995). The only remaining assertion by Charles of a basis for her implied contract claim is statements by plaintiff's supervisors—but not by Clinger—that she "was doing an excellent job" and that she could "plan on retiring from defendant" as long as this remained true.

As defendant notes, Charles has never deposed the supervisors who allegedly said this, nor presented affidavits of such comments. Nonetheless, even assuming such comments were made, and even assuming they formed the basis for creating an implied contract, Charles has failed to show any breach of the resulting contract. That is because the alleged contract, by its express terms, was not simply to let Charles retire from the Eagle, but only that she could do so as long as she worked hard and performed excellent work. Given the uncontroverted facts discussed earlier— that the Eagle suffered a monumental embarrassment which was primarily Charles's fault, and that this occurred af-

ter previous errors and warnings—the court must conclude that, even assuming such a contract existed, it was not violated when Charles was terminated after the omission of the garage sale ads.

IT IS ACCORDINGLY ORDERED this 31st day of March, 1999, that the defendant's motion for summary judgment (Dkt. No. 36) is granted; the various motions to strike (Dkt. No's 40, 43, and 46) are denied as moot.